**DYNAMIS LLP**
ERIC S. ROSEN (*pro hac vice* forthcoming)
erosen@dynamisllp.com
(617) 802-9157
MICHAEL B. HOMER (*pro hac vice* forthcoming)
mhomer@dynamisllp.com
(617) 693-9732
175 Federal Street, Suite 1200
Boston, Massachusetts 02110

YUSEF AL-JARANI (Cal Bar No. 351575)
yaljarani@dynamisllp.com
(213) 283-0685
1100 Glendon Ave., 17th Floor
Los Angeles, California 90024

AARON KATZ (*pro hac vice* forthcoming)
akatz@aaronkatzlaw.com
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305

*Attorneys for Plaintiffs Andrew Left
and Citron Capital, LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW LEFT and CITRON CAPITAL, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>ANSON FUNDS MANAGEMENT LP, ANSON ADVISORS INC., MOEZ KASSAM, and SUNNY PURI,<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR:**<br>**1. DEFAMATION**<br>**2. BUSINESS DISPARAGEMENT**<br><br>DEMAND FOR JURY TRIAL<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL.** |

Plaintiffs Andrew Left ("Left") and Citron Capital, LLC ("Citron," and collectively "Plaintiffs"), upon their personal knowledge, information and belief, allege as follows against Defendants Anson Funds Management, LP ("Anson Funds"), Anson Advisors, Inc. ("Anson Advisors," and together with Anson Funds "Anson"), Moez Kassam ("Kassam"), and Sunny Puri ("Puri," and collectively "Defendants"):

## NATURE OF THE ACTION

1.     Andrew Left is a short seller. He has made his career uncovering companies engaged in corporate fraud, betting against those companies' overvalued stocks, exposing the fraud to the marketplace, and then, if the information proved accurate, profiting when the market corrected downward. By exposing corporate fraud within publicly traded entities, Left has increased price efficiency in the markets, prevented further destruction of investment capital, and protected retail investors from catastrophic losses.

2.     In September 2018, after extensive research, Left uncovered evidence showing that Namaste Technologies, Inc. ("Namaste" or the "Company"), a cannabis company led by a serial fraudster, was engaged in a massive fraud. Left predicted that Namaste's stock would eventually go to zero. Left, as with many of the companies he investigated, was correct. Namaste *was* engaged in a fraud, and its stock *did* go down to effectively zero.

3.     Because of his research, Left wanted to short Namaste's stock through his trading firm Citron, which would require him to first borrow Namaste shares. Namaste is a Canadian company, making it difficult for Left, who did not have a brokerage account allowing him to hold Canadian shares, to borrow more than a minimal number of shares in the United States where the stock was trading over the counter.

4.      Moez Kassam, a friend of Left and the Co-Founder, Chairman, and Chief Investment Officer of the hedge fund Anson—a fund that has a Toronto branch licensed to trade equities in Canada—offered to short the stock on Citron's, and by extension Left's, behalf. Kassam, on behalf of Anson, agreed to distribute profits to Plaintiffs if the trade was successful; if the trade was unsuccessful, Plaintiffs would be responsible for any losses.

5.      In September and October 2018, Anson shorted Namaste's stock for Plaintiffs, and Left, through Citron, published a short report exposing Namaste's fraud. After the price of the stock plummeted, Anson, on its own volition, covered the short position for a profit. Because Anson had borrowed shares on Citron's (and Left's) behalf, it owed Citron (and Left) money.

6.      Left did not care how Anson paid him. Left planned to (and did) account for the money as income on his tax returns. What Left did not know—and would not discover until after his indictment by the Department of Justice—is that Anson *did* care (very much) how Left got paid. Rather than pay Left through Citron directly, Anson arranged for him to be paid through a third-party research company, Falcon Research, Inc. ("Falcon Research" or "Falcon").

7.      Anson cared about how its payments to Left were reported for two main reasons. First, Anson managed money for outside investors and earned profits for those investors by shorting company stock and buying it back at a lower price. Paying a third party for the successful short of stock (in this case Namaste stock) would have made it appear to Anson's investors that it was improperly diverting monies away from the investors to a third party.

8.      Second, and perhaps more important, Anson had significant conflicts of interest that it did not disclose to either its investors or, at the time, regulators. In addition to shorting Namaste stock and covering that short at a profit, Anson was also ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, which meant that it stood to benefit if the

1   Namaste stock price decreased. The lower the stock price, ███████████

2   ████████. Anson thus did not want to appear to have coordinated with a short

3   seller to drive down the price of Namaste so that █████████████████

4   ████████████████████. Because of this, ████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████

7        9.      Accordingly, Anson's executives, including Kassam and Puri, devised

8   a scheme to mask its relationship with Plaintiffs. Anson directed Plaintiffs' profits

9   from the shorted Namaste shares to be paid directly to Falcon Research, a third-party

10  research provider run by Kurt Feshbach. To justify the payments of more than $1

11  million to Falcon Research, Anson created a series of false invoices that made it

12  appear like Anson was (appropriately) paying for research services, when, in fact,

13  Anson was using Feshbach's company to funnel trading proceeds to Plaintiffs. Once

14  the monies were received by Feshbach, Feshbach paid the funds to Citron and

15  ultimately Left. In short, rather than account for the money as trading proceeds paid

16  directly to Citron, Anson disguised the funds as research payments to Falcon to mask

17  its involvement in injecting (truthful) negative information about Namaste into the

18  market for its own benefit. To be clear, the decision to funnel payments through

19  Falcon and to disguise the payments as payments for research was the decision of

20  Anson, and Anson alone.

21        10.     A few years later, Anson was investigated by the SEC for misleading

22  its investors about its arrangements with Left and other short sellers. The false

23  invoices Anson devised to pay Plaintiffs through Falcon Research were highly

24  material to the SEC's inquiry. But instead of telling the truth about the false invoices,

25  Defendants Kassam and Puri, acting on behalf of Anson and (because they could face

26  individual liability) themselves, lied, ████████████████████████

27

28                                    - 4 -

1

2

3    11.    ████████████████ Plaintiffs were sent *Wells* notices by the

4    SEC ████████████ in the fall of 2023. During the *Wells* submission

5    process, it became clear that the false invoices (including who directed their creation)

6    were critical to who the SEC (and subsequently the Department of Justice ("DOJ"))

7    would charge. ████████████████████████████████

8    ████████████████████████████████████

9    12.    ████████████████ allowed Anson to escape the wrath of the

10   SEC (and DOJ) with just a slap on the wrist.[1] Anson was not sued by the SEC (nor

11   charged by the DOJ), and instead was allowed to resolve the investigations in an

12   administrative "cease-and-desist" proceeding where Anson did not admit or deny any

13   allegations concerning the investigation, and paid a penalty of just $2.25 million, a

14   figure that did not even cover Anson's trading profits from Namaste. Even worse,

15   Anson's principals, who *did* provide ████████████████, suffered no

16   consequences whatsoever. The SEC's own findings of fact ████████████

17   stating that it was Left who asked Anson to "send him his share of trading profits

18   through a third-party intermediary."

19   13.    Defendants' lies, while saving Anson and its principals from certain

20   regulatory action, significantly damaged Left. In July 2024, *after* Defendants ████

21   ████████████, Left was charged in a civil complaint by the SEC and indicted by

22   the Department of Justice. Both charging instruments made clear that the false invoice

23   scheme played a major role in the decision to charge Plaintiffs. The SEC Complaint

24   alleged that *Left*, not Anson, "took active steps to conceal the financial arrangements

25   he had with … Anson" by "funnel[ing] profits through a third-party intermediary."

26   ――――――――――――

[1] *See* Order, *In the Matter of Anson Advisors, Inc. and Anson Funds Management, LP*,
27   Inv.    Adv.    Act    Rel.    No.    6622    (June    11,    2024),
     https://www.sec.gov/files/litigation/admin/2024/ia-6622.pdf.

28

The DOJ Indictment stated that "[d]efendant LEFT directed [Anson] to send defendant LEFT's share of the trading profits through a third-party intermediary to conceal the true beneficiary and purpose of the payments from [Anson] to defendant LEFT."

14.    Moreover, recent comments by federal prosecutors demonstrate just how important this so-called evidence of false invoices is to the DOJ's (and SEC's) case. In a recent hearing in federal court on Left's motion to dismiss the DOJ Indictment, federal prosecutors specifically emphasized Left's "use of false invoices to conceal his compensation." And it is not hard to see why prosecutors place so much emphasis on these false invoices—the DOJ's case against Left does not charge with him making a single false statement about any of the securities at issue, including Namaste. Rather, the DOJ claims that Left's tweeted opinions about marquee stocks such as Nvidia, Facebook, and Tesla were not "sincerely held" because he traded out of positions shortly after tweeting about those stocks. Given that the vast majority of the at-issue statements about these stocks were accurate, the DOJ has seized on these allegedly "false invoices" as *prima facie* evidence that Left knew what he was doing was wrong.

15.    In short, Defendants' malicious lies ███████████████ ███████████████████████ even though the evidence clearly demonstrates that it was Defendants who devised the scheme—have resulted in grave injuries to Plaintiffs. Left has been indicted by a federal grand jury and Plaintiffs have been sued by the SEC. The federal government now wants to put Left in prison. The charges have irreparably tarnished his otherwise sterling reputation as someone who exposes frauds (and does not participate in them). The charges have also cost Plaintiffs an untold amount of money in legal fees and in monies lost because Plaintiffs can no longer fully participate in the capital markets. In sum, Defendants' lies have fundamentally and irreparably changed Left's life for the worse. Now, they must be held accountable.

- 6 -

**PARTIES**

16.    Plaintiff Andrew Left is a short seller who currently resides in Boca Raton, Florida. He was a resident of Beverly Hills, California at all times relevant to this Complaint.

17.    Plaintiff Citron Capital, LLC is an investment adviser established by Left in October 2018. Citron registered with the SEC as an investment adviser between October 2018 and April 2019, and thereafter was an exempt reporting adviser registered with the California Department of Business Oversight until March 2022. Citron was incorporated and had its principal place of business in California at all times relevant to this Complaint. Citron publishes research reports on companies through its platform Citron Research's website and Twitter/X account and is Left's primary vehicle for trading.

18.    Defendant Anson Funds Management LP is a hedge fund and limited partnership organized under the laws of Texas with its principal place of business in Dallas, Texas. It has been registered as an investment adviser with the SEC since 2012.

19.    Defendant Anson Advisors Inc. is a hedge fund and corporation organized under the laws of Ontario, Canada with its principal place of business in Toronto, Canada. Anson Advisors is registered with the Ontario Securities Commission and has reported to the SEC as an exempt reporting adviser since 2013.

20.    Anson Funds and Anson Advisors are co-investment advisers of a number of privately-pooled investment vehicles. Anson was the subject of a cease-and-desist action and administrative proceeding with the SEC related to its work with Left and other short publishers.[2]

---

[2] *Supra* n.1.

COMPLAINT

21.     Defendant Moez Kassam is Co-Founder, Chairman, and Chief Investment Officer of Anson, and, on information and belief, resides in Toronto, Canada.

22.     Defendant Sunny Puri is Co-Head of Investments at Anson, and, on information and belief, resides in Toronto, Canada. Puri "is deeply involved in all aspects of Anson's investment process,"[3] ███████████████████████████████ ███████████████████████████████████████████████████████████████ ████████

23.     Non-party Securities and Exchange Commission is a civil law enforcement agency charged with enforcing this Nation's securities laws.

24.     Non-party DOJ is a criminal law enforcement agency that, as relevant here, conducts investigations in parallel and jointly with the SEC to enforce this Nation's securities laws.

## JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction over the state law claims alleged herein under 28 U.S.C. § 1332 because there is complete diversity between the parties, and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

26.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

27.     This Court has personal jurisdiction over Defendants because Kassam and Puri each purposefully directed their tortious activity at California, including by traveling to Los Angeles to publish the defamatory statements ████████ in their individual and official capacities as principals of Anson, and by sending reports and

---

[3] *Sunny Puri*, ANSON, https://ansonfunds.com/team/sunny-puri/ (last visited Sept. 28, 2025).

1   submissions to the SEC in Los Angeles, knowing that their false statements would
2   affect Left in his domicile in California.

3                        **GENERAL ALLEGATIONS**

4   **A.    The SEC Investigates Defendants for Securities Law Violations**

5         28.    Anson has a history of playing fast and loose with securities trading
6   rules.

7         29.    In 2016, the SEC investigated Anson Funds and Anson Advisors—then
8   organized as Frigate Ventures LP and M5V Advisors Inc., respectively—and,

9

10

11        30.    The SEC found

12

13

14        31.    The SEC also found that Anson employees

15

16                                            which, if any of the information was fraudulent, would violate
17   the Securities Act of 1933, the Securities Exchange Act of 1934 ("Exchange Act"),
18   and the Advisers Act.

19        32.    The SEC further concluded that Anson

20

21

22                                            which violated or could violate the
23   Advisers Act.

24        33.    Because the 2016 investigation into Anson was private, Left was
25   unaware of Anson's questionable practices at the time he did business with them.

26

27

28                                            - 9 -

**B.    Defendants Approach Left and Offer to Short Namaste Stock**

34.    Left has known Kassam and Puri for years and regularly messaged and communicated with both Defendants about various companies.

35.    On September 7, 2018, Puri, unsolicited, texted Left to discuss a number of different cannabis companies Puri believed to be frauds. During the exchange, Puri brought up Canadian cannabis company Namaste and asked if Left was able to "borrow" its stock to short it. He added, "it's an easy tweet," suggesting that Left would stand to benefit from shorting the stock, then publicly revealing it to be fraudulent. Left responded simply, "no," and moved on from the topic.

36.    Left was independently familiar with Namaste and had come to believe it was a fraud after extensively researching it. The Company was run by Sean Dollinger, who would, just months later, be fired by Namaste's board of directors for misconduct and mismanagement.[4] However, even though Left had shorted other cannabis companies he believed were fraudulent, he had not shorted Namaste because he did not have a brokerage account that allowed him to hold Canadian shares. In Canada, Namaste was listed on the TSX Venture Exchange; in the United States, Namaste only traded over the counter, meaning that Left could not borrow more than a minimal number of shares.

37.    On September 11, 2018, Kassam, unsolicited, emailed Left about a "pledge party" featuring Snoop Dogg that Namaste was hosting in Montreal, Canada the following day. According to Kassam, if participants pledged not to sell Namaste stock, the Company would invite them to the party. He painted the event as a "pump-and-dump" scheme, noting that one of the event organizers was "pumping Namaste," and that the last time Namaste hosted a similar event, "insiders blasted out shares" (*i.e.*, sold or "dumped" them in large numbers) the next day.

---

[4] *See* Jeff Lagerquist, *Namaste Technologies Fires CEO, Exploring Sale of Company*, YAHOO! FINANCE (Feb. 4, 2019), https://ca.finance.yahoo.com/news/namaste-technologies-fires-ceo-exploring-sale-company-141645325.html.

COMPLAINT

38.    To Left, the apparent pump-and-dump scheme was further evidence that Namaste was a fraud and ripe for shorting.

39.    Left responded to Kassam, expressing his disappointment that he could not borrow shares of Namaste stock in order to short it.

40.    Kassam replied to Left, offering, on behalf of Anson, to "short it for you, *and send a cheque*." He added that Anson had just traded $100 million in volume that day, indicating it had the capability to borrow a significant number of shares if Left desired to do so.

41.    Kassam later admitted ███████████████████████████████
████████████████████

42.    Left had not previously considered the possibility of shorting Namaste through a Canadian fund. He welcomed the opportunity and accepted Anson's offer.

43.    Defendants and Left first agreed that Left, through Citron, would receive 15-20% of any profit Anson made from shorting Namaste's stock for him, but at some point, Anson and Left agreed on a fixed number of shares that would be allocated to Left.

**C.    Defendants and Left Collaborate on a Research Report on Namaste**

44.    As part of Left's collaboration with Anson and Anson's agreement to short Namaste's stock for him, Defendants asked Left to publish his research on Namaste's fraud through Citron on the Citron Research website and Twitter.

45.    Left had no problem doing so. He routinely published, through Citron, research reports and social media reports on frauds he had uncovered. Left only published what he believed to be truthful information or opinions, and has never been successfully sued by any company for defamation.

46.    Left almost always wrote his own research reports, but Defendants wanted him to include some of their own research and wording in his publications. He acquiesced, provided they verified the language's accuracy.

47.     Defendants were so eager to expose Namaste that they provided Left with a lengthy draft research report at 8:25 a.m. on September 12, 2018, the morning after they had agreed to short the stock for him.

48.     After editing the report and verifying its accuracy, on September 13, 2018, Left published the report on Citron's website and Twitter, and later also created the website namastetruth.com with information about Namaste's fraud. Among other things, the publications revealed that Namaste's CEO lied about the Company being approved for a Nasdaq listing and had also failed to disclose related-party transactions.

**D.      Defendants Arrange to Pay Left via Sham Invoices to a Third Party**

49.     Left was right about Namaste. It was a fraud and the Company's stock price did eventually plummet to essentially $0. All the information published by Citron was truthful and accurate.

50.     Plaintiffs and Anson were successful in their short strategy, earning a profit of nearly $5 million. Plaintiffs' profit from the shares that Anson had agreed to short on their behalf amounted to approximately $840,000.

51.     Rather than pay Left through Citron directly, Kassam or Puri asked Left something to the effect of, "Do you mind if we pay Kurt and he pays you?" They were referring to Kurt Feshbach, President of Falcon Research. Left did not care how Anson paid him, and assumed the request was one of convenience, so he said okay.

52.     ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

1

2

3    53.

4

5

6

7

8

9    54.

10

11

12

13

14       55.     Because accepting payment through a third-party intermediary wasn't

15 Left's idea, he did not know who he should invoice, so he asked Feshbach in a direct

16 message, "am i invoice you[sic] or Falcon?" Feshbach responded, "Falcon."

17    56.

18

19

20

21

22

23

24

25

26

27

28



COMPLAINT

63. ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

64. ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

65. ███████████████████████████████████████████████

**E.    Defendants' Motive Was to Conceal Their Conflicts of Interest**

66. ███████████████████████████ was, in fact, par for the course for Kassam and Puri. It is how they avoided regulatory scrutiny.

67. ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

68. █████████████████████████ Anson was participating in a bought deal offering for Namaste, announced on September 26, 2018, in which Anson would take a long position in the stock. █████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

69. ██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

1
2

70.     Defendants therefore did not want to make it appear that they paid a short seller to drive the price down so that the financing would be more favorable for them, while they profited off the price dip on a short position.

71.     And that is precisely what they did. Kassam and Puri devised to leverage the exposure of Namaste as a fraud to pressure the bought deal's underwriter, Eight Capital, LP ("Eight Capital"), to either cancel the deal or give Anson a discount on the stock. The former would plunge the stock price even further, in which case Anson could cover its short position for a higher profit; the latter would allow Anson to take a long position at a steep discount.

72.     On September 26, 2018, Kassam texted Puri and Left that "Namaste bot deal [m]ay be even better now," because Kassam "know[s] the lead order" and "[t]hey will force a reprice [o]r tell 8 [Capital] they are walking."

73.     On September 30, 2018, Puri sent Left a draft follow-up report on Namaste. This new report from Defendants included language "recommend[ing] investors that bought the $3/share financing to rethink their purchase"—referring to the original pricing on the bought deal financing.



74.

75.

76.    Kassam knew what he was doing.

77.    On October 28, 2018, Left texted Puri that he "might take down the namaste website" (namastetruth.com), but Puri asked him not to do so until "[a]fter close" (*i.e.*, after Anson closed the bought deal financing at a discounted price).

78.

79.

80.

81.

82.

83.

84.

85.

86.

F.   **Kassam and Puri**

87.    In or around 2018, the SEC, in parallel with the DOJ, opened an investigation entitled "In the Matter of: Trading in Advance of Certain Online Stock Commentary."

88.    Because of subpoenas issued by the SEC and the FBI, it was well publicized during the investigation that both criminal and civil regulators were investigating short sellers and hedge funds.[5]

89.    Upon information and belief, Anson, together with its principals, became a target of that investigation.

90.    As a part of the parallel SEC and DOJ investigations,

---

[5] *See, e.g.*, Jody Godoy, Svea Herbst-Bayliss & Chris Prentice, *Carson Block's Muddy Waters Among Short Sellers Being Probed by U.S. Justice Dept.*, REUTERS (Feb. 16, 2022), https://www.reuters.com/business/finance/federal-prosecutors-probing-short-sellers-wsj-2022-02-16/.



1    91.    SEC deposition testimony is routinely provided to federal criminal
2  prosecutors as part of a parallel investigation, and testimony before the SEC can be
3  used to prosecute an individual for criminal securities fraud.

4    92.    Puri's 2022 FBI interview was attended by multiple FBI agents and
5  DOJ criminal prosecutors, as well as three SEC attorneys, confirming that the two
6  agencies were working in parallel to bring criminal charges and that Defendants were
7  aware of that. The same three SEC attorneys who attended Puri's interview later
8  participated in the deposition of Kassam, and two of the three attorneys also
9  participated in Puri's deposition before the SEC.



1    98.    ████████████████████████████████████████
2    ████████████████████████████████████████████████
3    ████████████████████████████████████

4        99.    Of course, Puri, like Kassam, was well aware that Left had nothing to
5    do with directing payments through Falcon Research using falsified invoices and that
6    it was, in actuality, he and Kassam who arranged to use an intermediary to pay Left.

7    100.    ████████████████████████████████████████
8    ████████████████████████████████████████████████
9    ████████████████████████████████████████████████
10    ████████████████████████████████████████████████
11    ████████████████████████████████████████████████
12    ████████████████████████████████████████████████
13    ████████████████████████████████████████████████
14    ████████████████████████████████████████████████
15    ██████████████

16    101.    ████████████████████████████████████████
17    ████████████████████████████████████████████████
18    ███████████████████████

19        **G.    The SEC Investigates Anson (Again) and Fines It (Twice)**

20        102.    The government was onto at least some of Defendants' misconduct.

21        103.    On October 19, 2023, the SEC entered into a settlement agreement with
22    Anson Advisors for buying stock in public offerings for private fund clients after
23    shorting the very same stock, in violation of the Exchange Act. Anson Advisors paid
24    $3.33 million in disgorgement and penalties.[6]

25

26    _____

27    [6] *See* Order, *In the Matter of Anson Advisors, Inc.*, Inv. Adv. Act Rel. No. 98775 (Oct. 19, 2023), https://www.sec.gov/files/litigation/admin/2023/34-98775.pdf.

28                                    - 20 -

104.    On June 11, 2024, the SEC entered into a *second* settlement agreement, this time with Anson Advisors *and* Anson Funds for numerous securities law violations. The SEC's order concluded that Anson willfully misled investors by failing to disclose that it paid short sellers to publish negative articles about companies it had taken a short position in, including specifically failing to disclose that it paid Left for publishing research about Namaste that Anson then traded around.[7] Anson paid $2.25 million in penalties.

105.    ████████████████ the Falcon Research invoices were critical to the second investigation and settlement.

106.    ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████ the SEC provided ████ *Wells* notices to Plaintiffs.

107.    ████████████████████████████

████████████████████████████████

████████████████████████████████.

108.    ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

109.    ████████████████████████████

████████████████████████████████

████████████████████████████████

────────────────
[7] *Supra* n.1.

- 21 -

1

2

3

4

5

6

7    110.

8

9

10

11    111.

12

13

14

15

16

17    the SEC believed that Anson was defrauding its investors by

18  executing transactions for Left in its funds.

19    112.

20

21

22

23

24

25

26

27

28

1    113.    The June 11, 2024, administrative settlement between Anson and the
2    SEC had just fifteen factual paragraphs. The SEC did not charge any individuals, such
3    as Kassam or Puri, and Anson did not admit or deny any of the allegations.

4    114.    The SEC's factual rendition effectively repeated ███████████
5    ██████████████████████████. One paragraph stated: "As a result of
6    AIMF's [Anson Investment Master Fund's] trading in Namaste … [Left] was owed
7    … trading profits. [Left] did not pay or contribute funds to [Anson] to purchase
8    securities in [] Namaste…. *[Left] asked Anson Advisors to send him his share of*
9    *trading profits through a third-party intermediary, to which [Anson] agreed.* The
10   third-party intermediary provided Anson Funds with invoices for purported research
11   services that had not been performed by the third-party intermediary and inaccurately
12   stated that the amounts invoiced were for the benefit of the third-party intermediary,
13   when they were for the benefit of [Left]. Anson Funds issued payment to the third-
14   party intermediary, and [Left] collected payment from that third-party intermediary."

15   **H.    The DOJ and SEC Prosecute Left Based on** █████████
16   115.    █████████████████████████████████████████████
17   ██████████████████████████████████████████████████████
18   █████████████████████████████████████████. Accordingly,
19   Defendants knew, or consciously disregarded a substantial risk, that their lie would
20   result in civil and criminal charges against Plaintiffs but told these lies anyway to save
21   their own skins. It worked—Anson did not "admit or deny" any allegations, and no
22   individual who worked at Anson, including Kassam and Puri, were charged or fined
23   for their misconduct.

24   116.    Left, however, *was* charged for Defendants' misconduct.

25   117.    On July 25, 2024, the DOJ indicted Left, charging him with criminal
26   securities fraud. The Indictment devoted nearly two-pages to the topic of the false
27   invoices and the payments from Anson. The Indictment listed out each invoice, and

28

1   alleged, as evidence of consciousness of guilt, that "[d]efendant LEFT directed
2   [Anson] to send defendant LEFT's share of the trading profits" from shorting
3   Namaste "through a third-party intermediary to conceal the true beneficiary and
4   purpose of the payments," and that "at defendant LEFT's direction, [Feshbach]
5   provided [Anson] with false invoices."

6       118.    In addition, directly borrowing from ███████████████████
7   ██████████████████████     (as opposed to receiving payment for trades made
8   on his behalf), the Indictment claimed that Left lied to federal agents when he told
9   them (truthfully) that there was no "compensation" between himself and hedge funds.
10  This was false, the Indictment claimed, because "defendant LEFT received
11  compensation from [Anson] in advance of the issuance of Citron's commentary." Left
12  has been charged with criminal violations of 18 U.S.C. § 1001 because of these
13  alleged false statements.

14      119.    On July 26, 2024, the SEC filed a complaint against Plaintiffs for claims
15  of civil securities fraud. The SEC similarly alleged, as evidence of consciousness of
16  guilt, that "Left took steps to conceal that he was being compensated by Anson in
17  connection with" shorting Namaste "by asking Anson to send him his share of trading
18  profits through [Falcon Research]."

19  **I.      Left Discovers Defendants' Lies and Suffers Damages**

20      120.    Left was shocked when he read the DOJ's and SEC's allegations that it
21  was he who directed Anson to pay him his Namaste trading proceeds through Falcon
22  Research, when the opposite was true. He did not know how the government got it so
23  backwards and thought it must be a mistake.

24      121.    On or after October 8, 2024, the DOJ sent a letter to Left's counsel
25  concerning discovery "Production 3," which stated that the DOJ would provide a hard
26  drive to counsel containing this production.

27

28                                    - 24 -

1    122.    Included on the hard drive later received by Left's present counsel

2 (containing Production 3) were ████████████████████████████████████████

3 ████████████████    Although Defendants had previously provided the transcripts to

4 Left's former counsel under a joint defense agreement in November 2023, they

5 designated the transcripts "Attorneys' Eyes Only," which meant that Left's former

6 counsel did not (and could not) disclose the contents of the transcripts to Left.

7    123.    It was only after October 8, 2024, when the government produced the

8 transcripts to Left—pursuant to a protective order that authorized Left to finally

9 review the discovery—that Left had access to the transcripts. Prior to then, pursuant

10 to the Attorneys' Eyes Only agreement, Left had no ability to access the transcripts

11 and could not have reasonably discovered Defendants' lies.

12    124.    In 2025, when reviewing discovery for the first time, Left discovered

13 by reading ██████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████████

18    125.    Further, it was not until late September 2025 that the DOJ,

19 acknowledging the parallel investigation between itself and the SEC, released to

20 Left's counsel ████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23    126.    The DOJ's and SEC's public law enforcement actions, together with

24 the extensive media coverage they have drawn, have resulted in severe damage to

25 Plaintiffs.

26    127.    Left has been indicted by the DOJ, and Plaintiffs have been sued by the

27 SEC, at least in part because of Defendants' ████████████████████████.

28

128.   Defendants' lies have severely damaged Left's reputation, and that of his company Citron. Left was once seen as a man who routinely exposed fraudulent companies, but he now was falsely accused of having committed fraud himself.

129.   Because of the enforcement actions and the attention they drew, Plaintiffs had to cut back on trading and divert their efforts to defending themselves. Trading is how Left makes his living, and Plaintiffs lost of millions of dollars in probable earnings as a result.

130.   Plaintiffs also have had to spend significant sums of money on legal expenses. Their defense costs alone, including attorneys' fees and legal expenses post-Indictment and -SEC Complaint, have exceeded $1,000,000.

**J.     In Pre-Filing Discussions, Anson Confirms It Misled the SEC**

131.   Prior to filing this Complaint, Plaintiffs' counsel approached Defendants' counsel to discuss their claims and attempt to mitigate damages.

132.   As part of those discussions, Plaintiffs and Defendants entered into tolling agreements that tolled the statute of limitations periods for Plaintiffs' defamation and trade libel claims from October 1, 2025, to October 29, 2025.

133.   During the parties' discussions, Defendants essentially conceded, in writing, that they had ███████████████████████████. Effectively, Defendants claim, in an attempt to argue that they did not defame Plaintiffs, that they never ████████████████████████████████.

134.   This representation contradicts Defendants' ████████████ ████████████████████████████████████████ ████████████.

**FIRST CAUSE OF ACTION**

**(Defamation and Defamation *Per Se*, Cal. Civ. Code §§ 44–46)**

135.   Plaintiffs repeat, re-allege, and incorporate by reference the allegations in Paragraphs 1–135 as if set forth fully herein.

- 26 -

136. ███████████████████████████████

████████████████████ Defendants published or caused to be

published defamatory statements ████████████, which contained

unprivileged false assertions of fact of and concerning Plaintiffs, which █████

█████████████████████ [8]

137. ███████████████████████████████

███████████████████ Defendants made false reports to ████

a civil law enforcement agency, which contained unprivileged, false assertions of fact

of and concerning Plaintiffs, which ████████████████

███ .

138.    The defamatory statements are defamatory *per se* because they impute

serious criminal misconduct to Plaintiffs, injure him in his trade or profession, and/or

describe conduct, characteristics, or conditions incompatible with the proper exercise

of a lawful business, trade, or profession, and otherwise subject Plaintiffs to hatred,

distrust, ridicule, contempt, or disgrace.

139.    No reasonable person under the circumstances would have published

the defamatory statements.

140.    Defendants published or caused to be published the defamatory

statements with knowledge that they were false and/or with reckless disregard for

their truth or falsity.

141.    Upon information and belief, Defendants published or caused to be

published the defamatory statements with the specific intent to cause harm to

Plaintiffs, showing willful misconduct, malice, fraud, wantonness, oppression, or that

[8] California Civil Code Section 47(b)(5) provides that communications concerning potential criminal activity between a person and law enforcement are not privileged when made with knowing falsity or with reckless disregard for the truth or falsity of the communications.

- 27 -

COMPLAINT

1  entire want of care which raises the presumption of conscious indifference to
2  consequences, justifying an award of punitive damages.

3       142.   As a direct and proximate result of the defamatory statements, Plaintiffs
4  have suffered presumed, actual, and special damages, including humiliation, damage
5  to reputation, lost business opportunities, and other pecuniary damage.

6                          **SECOND CAUSE OF ACTION**
7                **(Business Disparagement, Cal. Civ. Code §§ 44–46)**

8       143.   Plaintiffs repeat, re-allege, and incorporate by reference the allegations
9  in Paragraphs 1–135 as if set forth fully herein.

10      144.   ██████████████████████████████████████████
11  ████████████████████████████████ Defendants published or caused to be
12  published disparaging statements █████████████████, which contained
13  unprivileged false assertions of fact of and concerning the character of Plaintiffs'
14  business, which ████████████████████████████████████████
15  ███.

16      145.   ██████████████████████████████████████████
17  ██████████████████████████ Defendants made false reports to ████████
18  a civil law enforcement agency, which contained unprivileged, false assertions of fact
19  of and concerning Plaintiffs, which ██████████████████████████████
20  ██████████████████.

21      146.   No reasonable person under the circumstances would have published
22  the disparaging statements.

23      147.   Defendants knew that others, including the SEC and DOJ, would act in
24  reliance on their disparaging statements, causing Plaintiffs financial loss.

25      148.   Defendants published or caused to be published the disparaging
26  statements with knowledge that they were false and/or with reckless disregard for
27  their truth or falsity.

28                                - 28 -

149.    Upon information and belief, Defendants published or caused to be published the disparaging statements with the specific intent to cause harm to Plaintiffs, showing willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, justifying an award of punitive damages.

150.    As a direct and proximate result of the disparaging statements, Plaintiffs have suffered presumed, actual, and special damages, including lost business opportunities and other pecuniary damage.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor, and against Defendants, awarding the following relief:

A.    General damages, including actual and presumed damages, in an amount to be determined at trial;

B.    Special damages, including actual and consequential damages, in an amount to be determined at trial;

C.    Punitive and/or exemplary damages in an amount to be determined at trial;

D.    Reasonable expenses, including but not limited to reasonable costs and attorneys' fees, incurred to mitigate the harm caused by Defendants' defamatory and tortious conduct, including without limitation the fees incurred in defending against Defendants' false and defamatory statements and money spent on efforts to counteract the negative impact of Defendants' defamatory statements on Plaintiffs' reputation;

E.    Reasonable costs and attorneys' fees incurred in bringing this action to restore Plaintiffs' reputation;

F.    A narrowly tailored injunction that prohibits Defendants from repeating and republishing all of the statements that are adjudicated by this Court to be defamatory;

G.    All costs, disbursements, fees, and pre- and post-judgment interest as permitted by law; and

H.    Any other and further relief this Court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs demand that this case be tried to a jury.


Dated: October 30, 2025          */s/ Eric S. Rosen*
                                 Eric S. Rosen (*pro hac vice* forthcoming)
                                 Michael B. Homer (*pro hac vice* forthcoming)
                                 Yusef Al-Jarani
                                 Aaron Katz (*pro hac vice* forthcoming)

                                 **DYNAMIS LLP**

                                 *Attorneys for Plaintiffs Andrew Left*
                                 *and Citron Capital, LLC*

- 30 -
COMPLAINT