**DYNAMIS LLP**
ERIC S. ROSEN (*pro hac vice*)
erosen@dynamisllp.com
(617) 802-9157
MICHAEL B. HOMER (*pro hac vice*)
mhomer@dynamisllp.com
(617) 693-9732
175 Federal Street, Suite 1200
Boston, Massachusetts 02110

YUSEF AL-JARANI (Cal Bar No. 351575)
yaljarani@dynamisllp.com
(213) 283-0685
1100 Glendon Ave., 17th Floor
Los Angeles, California 90024

*Attorneys for Plaintiffs Andrew Left*
*and Citron Capital, LLC*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW LEFT and CITRON CAPITAL, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ANSON FUNDS MANAGEMENT LP, ANSON ADVISORS INC., MOEZ KASSAM, and SUNNY PURI, <br><br> Defendants. | Case No. 2:25-cv-10432 <br><br> **FIRST AMENDED COMPLAINT FOR:** <br> **1. DEFAMATION** <br> **2. BUSINESS DISPARAGEMENT** <br> **3. QUASI-CONTRACT/ UNJUST ENRICHMENT** <br><br> DEMAND FOR JURY TRIAL <br><br> <span style="color:red">**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL.**</span> |

Plaintiffs Andrew Left ("Left") and Citron Capital, LLC ("Citron," and collectively "Plaintiffs"), upon their personal knowledge, information and belief, allege as follows against Defendants Anson Funds Management, LP ("Anson Funds"), Anson Advisors, Inc. ("Anson Advisors," and together with Anson Funds "Anson"), Moez Kassam ("Kassam"), and Sunny Puri ("Puri," and collectively "Defendants"):

## NATURE OF THE ACTION

1.     Andrew Left is a short seller. He has made his career uncovering companies engaged in corporate fraud, betting against those companies' overvalued stocks, exposing the fraud to the marketplace, and then, if the information proved accurate, profiting when the market corrected downward. By exposing corporate fraud within publicly traded entities, Left has increased price efficiency in the markets, prevented further destruction of investment capital, and protected retail investors from catastrophic losses.

2.     In September 2018, after extensive research, Left uncovered evidence showing that Namaste Technologies, Inc. ("Namaste" or the "Company"), a cannabis company led by a serial fraudster, was engaged in a massive fraud. Left predicted that Namaste's stock would eventually go to zero. Left, as with many of the companies he investigated, was correct. Namaste *was* engaged in a fraud, and its stock *did* go down to effectively zero. Left saved investors tens of millions of dollars.

3.     Because of his research, Left sought to short Namaste's stock through his trading firm Citron, which would require him to first borrow Namaste shares. Namaste is a Canadian company, making it difficult for Left, who did not have a brokerage account allowing him to hold Canadian shares, to borrow more than a minimal number of shares in the United States where the stock was trading over the counter.

- 2 -

FIRST AMENDED COMPLAINT

4.    Moez Kassam, a friend of Left and the Co-Founder, Chairman, and Chief Investment Officer of the hedge fund Anson—a fund that has a Toronto branch licensed to trade equities in Canada—offered to short the stock on Citron's, and by extension Left's, behalf. Kassam, on behalf of Anson, agreed to distribute profits to Plaintiffs if the trade was successful; if the trade was unsuccessful, Plaintiffs would be responsible for any losses.

5.    In September and October 2018, Anson shorted Namaste's stock for Plaintiffs, and Left, through Citron, published a short report exposing Namaste's fraud. After the price of the stock plummeted, Anson, on its own volition, covered the short position for a profit. Because Anson had borrowed shares on Citron's (and Left's) behalf, it owed Citron (and Left) money.

6.    Left did not care how Anson paid him. Left planned to (and did) account for the money as income on his tax returns. What Left did not know—and would not discover until after his indictment by the Department of Justice—is that Anson *did* care (very much) how Left got paid. Rather than pay Left through Citron directly, Anson (months later) arranged for him to be paid through a third-party research company, Falcon Research, Inc. ("Falcon Research" or "Falcon").

7.    Anson cared about how its payments to Left were reported for two main reasons. First, Anson managed money for outside investors and earned profits for those investors by shorting company stock and buying it back at a lower price. Paying a third party for the successful short of stock (in this case Namaste stock) would have made it appear to Anson's investors that it was improperly diverting monies away from the investors to a third party.

8.    Second, Anson had significant conflicts of interest that it did not disclose to either its investors or, at the time, regulators. In addition to shorting Namaste stock and covering that short at a profit, Anson was also ███████████ █████████████████, which meant that it stood to benefit if the Namaste stock price

- 3 -

FIRST AMENDED COMPLAINT

decreased. The lower the stock price, ████████████████████████████. Anson thus did not want to appear to have coordinated with a short seller to release accurate information that could, if believed by the market, drive down the price of Namaste so that ████████████████████████████████ for Anson. Because of this, ████████████████████████████████████████████████████████████████████ ███████

9. Accordingly, Anson's executives, including Kassam and Puri, devised a scheme to mask its relationship with Plaintiffs. Anson directed Plaintiffs' profits from the shorted Namaste shares to be paid directly to Falcon Research, a third-party research provider run by Kurt Feshbach. To justify the payments of more than $1 million to Falcon Research, Anson created a series of false invoices that made it appear like Anson was (appropriately) paying for research services, when, in fact, Anson was using Feshbach's company to funnel trading proceeds to Plaintiffs. Once the monies were received by Feshbach, Feshbach paid the funds to Citron and ultimately Left. In short, rather than account for the money as trading proceeds paid directly to Citron, Anson disguised the funds as research payments to Falcon to mask its involvement in injecting (truthful) negative information about Namaste into the market for its own benefit. To be clear, the decision to funnel payments through Falcon and to disguise the payments as payments for research was the decision of Anson, and Anson alone.

10. A few years later, Anson was investigated by the SEC for misleading its investors about its arrangements with Left and other short sellers. The false invoices Anson devised to pay Plaintiffs through Falcon Research were highly material to the SEC's inquiry. But instead of telling the truth about the false invoices, Defendants Kassam and Puri, acting on behalf of Anson and (because they could face individual liability) themselves, lied, ████████████████████████████████

- 4 -

FIRST AMENDED COMPLAINT

██████████████████████████████████████████████████████

███████████████

11.    ████████████████████    Plaintiffs were sent *Wells* notices by the SEC ████████████████ in the fall of 2023. During the *Wells* submission process, it became clear that the false invoices (including who directed their creation) were critical to who the SEC (and subsequently the Department of Justice ("DOJ")) would charge. ████████████████████████████

██████████████████████████████████████████████████

12.    ████████████████████    allowed Anson to escape the wrath of the SEC (and DOJ) with just a slap on the wrist.[1] Anson was not sued by the SEC (nor charged by the DOJ), and instead was allowed to resolve the investigations in an administrative "cease-and-desist" proceeding where Anson did not admit or deny any allegations concerning the investigation, and paid a penalty of just $2.25 million, a figure that did not even cover Anson's trading profits from Namaste. Even worse, Anson's principals, who *did* provide ████████████████████, suffered no consequences whatsoever. The SEC's own findings of fact ████████████ stating that it was Left who asked Anson to "send him his share of trading profits through a third-party intermediary."

13.    Defendants' lies, while saving Anson and its principals from certain regulatory action (which would result in the implosion of their fund), significantly damaged Left. In July 2024, *after* Defendants ████████████████, Left was charged in a civil complaint by the SEC and indicted by the Department of Justice. Both charging instruments made clear that the false invoice scheme played a major role in the decision to charge Plaintiffs. The SEC Complaint alleged that *Left*, not Anson, "took active steps to conceal the financial arrangements he had with …

---

[1] *See* Order, *In the Matter of Anson Advisors, Inc. and Anson Funds Management, LP*, Inv. Adv. Act Rel. No. 6622 (June 11, 2024), https://www.sec.gov/files/litigation/admin/2024/ia-6622.pdf.

- 5 -

FIRST AMENDED COMPLAINT

Anson" by "funnel[ing] profits through a third-party intermediary." The DOJ Indictment stated that "[d]efendant LEFT directed [Anson] to send defendant LEFT's share of the trading profits through a third-party intermediary to conceal the true beneficiary and purpose of the payments from [Anson] to defendant LEFT."

14.     Comments by federal prosecutors demonstrate just how important this so-called evidence of false invoices is to the DOJ's (and SEC's) case. In a recent hearing in federal court on Left's motion to dismiss the DOJ Indictment, federal prosecutors specifically emphasized Left's "use of false invoices to conceal his compensation." And it is not hard to see why prosecutors place so much emphasis on these false invoices—the DOJ's case against Left does not charge with him making a single false statement about any of the securities at issue, including Namaste. Rather, the DOJ claims that Left's tweeted opinions about marquee stocks such as Nvidia, Facebook, and Tesla were not "sincerely held" because he traded out of positions shortly after tweeting about those stocks. Given that the vast majority of the at-issue statements about these stocks were accurate, the DOJ has seized on these allegedly "false invoices" as *prima facie* evidence that Left knew what he was doing was wrong.[2]

15.     In short, Defendants' malicious lies ██████████████████████ ██████████████████████ even though the evidence clearly demonstrates that it was Defendants who devised the scheme—have resulted in grave injuries to Plaintiffs. Left has been indicted by a federal grand jury and Plaintiffs have been sued by the SEC. The federal government now wants to put Left in prison. The charges have irreparably tarnished his otherwise sterling reputation as someone who exposes frauds (and does not participate in them). The charges have also cost Plaintiffs an untold

---

[2] Federal prosecutors have recently concluded that Anson and its principals lied to law enforcement under oath. In a recently filed superseding indictment, prosecutors (after extensive conversations with defense counsel and review of the evidence) have withdrawn the accusation that it was Left who concocted the false invoice scheme.

- 6 -

FIRST AMENDED COMPLAINT

amount of money in legal fees and in monies lost because Plaintiffs can no longer fully participate in the capital markets. In sum, Defendants' lies have fundamentally and irreparably changed Left's life for the worse. Now, they must be held accountable.

## **PARTIES**

16. Plaintiff Andrew Left is a short seller who currently resides in Boca Raton, Florida. He was a resident of Beverly Hills, California at all times relevant to this Complaint.

17. Plaintiff Citron Capital, LLC is an investment adviser established by Left in October 2018. Citron registered with the SEC as an investment adviser between October 2018 and April 2019, and thereafter was an exempt reporting adviser registered with the California Department of Business Oversight until March 2022. Citron was incorporated and had its principal place of business in California at all times relevant to this Complaint. Citron never had outside investors and instead solely traded Left's own money. Citron publishes research reports on companies through its platform Citron Research's website and Twitter/X account and is Left's primary vehicle for trading.

18. Defendant Anson Funds Management LP is a hedge fund and limited partnership organized under the laws of Texas with its principal place of business in Dallas, Texas. It has been registered as an investment adviser with the SEC since 2012.

19. Defendant Anson Advisors Inc. is a hedge fund and corporation organized under the laws of Ontario, Canada with its principal place of business in Toronto, Canada. Anson Advisors is registered with the Ontario Securities Commission and has reported to the SEC as an exempt reporting adviser since 2013.

20. Anson Funds and Anson Advisors are co-investment advisers of a number of privately pooled investment vehicles. Anson was the subject of a cease-

- 7 -

FIRST AMENDED COMPLAINT

and-desist action and administrative proceeding with the SEC related to its work with Left and other short publishers.[3]

21. Defendant Moez Kassam is Co-Founder, Chairman, and Chief Investment Officer of Anson, and, on information and belief, resides in Toronto, Canada.

22. Defendant Sunny Puri is Co-Head of Investments at Anson, and, on information and belief, resides in Toronto, Canada. Puri "is deeply involved in all aspects of Anson's investment process,"[4] ██████████████████████ ████████████████████████████████████ ████████

23. Non-party Securities and Exchange Commission is a civil law enforcement agency charged with enforcing this Nation's securities laws.

24. Non-party DOJ is a criminal law enforcement agency that, as relevant here, conducts investigations in parallel and jointly with the SEC to enforce this Nation's securities laws.

## JURISDICTION AND VENUE

25. This Court has subject-matter jurisdiction over the state law claims alleged herein under 28 U.S.C. § 1332 because there is complete diversity between the parties, and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

26. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

---

[3] *Supra* n.1.

[4] *Sunny Puri*, ANSON, https://ansonfunds.com/team/sunny-puri/ (last visited Sept. 28, 2025).

- 8 -

FIRST AMENDED COMPLAINT

27.    This Court has personal jurisdiction over Defendants because Kassam and Puri each purposefully directed their tortious activity at California, including by traveling to Los Angeles to publish the defamatory statements ███████ in their individual and official capacities as principals of Anson, and by sending reports and submissions to the SEC in Los Angeles, knowing that their false statements would affect Left in his domicile in California.

## GENERAL ALLEGATIONS

**A.    The SEC Investigates Defendants for Securities Law Violations**

28.    Anson has a history of playing fast and loose with securities trading rules.

██    In 2016, the SEC investigated Anson Funds and Anson Advisors—then organized as Frigate Ventures LP and M5V Advisors Inc., respectively—and, ██ ████████████████████████████████████████████████ ████████████████████████████████████████,

██    The SEC found ██████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████

31.    The SEC also found that Anson employees ██████████████ ████████████████████████████████████████████ ██████████████    which, if any of the information was fraudulent, would violate the Securities Act of 1933, the Securities Exchange Act of 1934 ("Exchange Act"), and the Advisers Act.

32.    The SEC further concluded that Anson ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████    which violated or could violate the Advisers Act.

FIRST AMENDED COMPLAINT

33.    Because the 2016 investigation into Anson was private, Left was unaware of Anson's questionable practices at the time he did business with them.

**B.    Defendants Approach Left and Offer to Short Namaste Stock**

34.    Left has known Kassam and Puri for years and regularly messaged and communicated with both Defendants about various companies.

35.    On September 7, 2018, Puri, unsolicited, texted Left to discuss a number of different cannabis companies Puri believed to be frauds. During the exchange, Puri brought up Canadian cannabis company Namaste and asked if Left was able to "borrow" its stock to short it. He added, "it's an easy tweet," suggesting that Left would stand to benefit from shorting the stock, then publicly revealing it to be fraudulent. Left responded simply, "no," and moved on from the topic.

36.    Left was independently familiar with Namaste and had come to believe it was a fraud after extensively researching it. The Company was run by Sean Dollinger, who would, just months later, be fired by Namaste's board of directors for misconduct and mismanagement.[5] However, even though Left had shorted other cannabis companies he believed were fraudulent, he had not shorted Namaste because he did not have a brokerage account that allowed him to hold Canadian shares. In Canada, Namaste was listed on the TSX Venture Exchange; in the United States, Namaste only traded over the counter, meaning that Left could not borrow more than a minimal number of shares.

37.    On September 11, 2018, Kassam, unsolicited, emailed Left about a "pledge party" featuring Snoop Dogg that Namaste was hosting in Montreal, Canada the following day. According to Kassam, if participants pledged not to sell Namaste stock, the Company would invite them to the party. He painted the event as a "pump-and-dump" scheme, noting that one of the event organizers was "pumping Namaste,"

---

[5] *See* Jeff Lagerquist, *Namaste Technologies Fires CEO, Exploring Sale of Company*, YAHOO! FINANCE (Feb. 4, 2019), https://ca.finance.yahoo.com/news/namaste-technologies-fires-ceo-exploring-sale-company-141645325.html.

- 10 -

FIRST AMENDED COMPLAINT

and that the last time Namaste hosted a similar event, "insiders blasted out shares" (*i.e.*, sold or "dumped" them in large numbers) the next day.

38.     To Left, the apparent pump-and-dump scheme was further evidence that Namaste was a fraud and ripe for shorting.

39.     Left responded to Kassam, expressing his disappointment that he could not borrow shares of Namaste stock in order to short it.

40.     Kassam replied to Left, offering, on behalf of Anson, to "short it for you, *and send a cheque*." He added that Anson had just traded $100 million in volume that day, indicating it had the capability to borrow a significant number of shares if Left desired to do so.

█     Kassam later admitted ████████████████████████
████████████████████████████

42.     Left had not previously considered the possibility of shorting Namaste through a Canadian fund. He welcomed the opportunity and accepted Anson's offer.

43.     Defendants and Left first agreed that Left, through Citron, would receive 15-20% of any profit Anson made from shorting Namaste's stock for him, but at some point, Anson and Left agreed on a fixed number of shares that would be allocated to Left.

44.     Kassam had initially suggested to Puri that they offer ████████ ████████████████████████ about Namaste, but knowing Left, Puri shot that down: ████████████████

**C.     Defendants and Left Collaborate on a Research Report on Namaste**

45.     As part of Left's collaboration with Anson and Anson's agreement to short Namaste's stock for him, Defendants asked Left to publish his research on Namaste's fraud through Citron on the Citron Research website and Twitter.

46.     Left had no problem doing so. He routinely published, through Citron, research reports and social media reports on frauds he had uncovered. Left only

- 11 -

FIRST AMENDED COMPLAINT

published what he believed to be truthful information or opinions, and has never been successfully sued by any company for defamation.

47.     Left almost always wrote his own research reports. As Kassam recently testified in a separate matter (a defamation case filed by Anson in Canada in which Anson sought CAD $111 million in damages), "Andrew Left is … probably the most independent research guy out there." But in this instance, Defendants wanted him to include some of their own research and wording in his publications. He acquiesced, provided they verified the language's accuracy.

48.     Defendants were so eager to expose Namaste that they provided Left with a lengthy draft research report at 8:25 a.m. on September 12, 2018, the morning after they had agreed to short the stock for him.

49.     After editing the report and verifying its accuracy, on September 13, 2018, Left published the report on Citron's website and Twitter, and later also created the website namastetruth.com with information about Namaste's fraud. Among other things, the publications revealed that Namaste's CEO lied about the Company being approved for a Nasdaq listing and had also failed to disclose related-party transactions.

**D.     Defendants Arrange to Pay Left via Sham Invoices to a Third Party**

50.     Left was right about Namaste. It was a fraud and the Company's stock price did eventually plummet to essentially $0. All the information published by Citron was truthful and accurate.

51.     Plaintiffs and Anson were successful in their short strategy, earning a profit of nearly $5 million. Plaintiffs' profit from the shares that Anson had agreed to short on their behalf amounted to approximately $840,000.

52.     Rather than pay Left through Citron directly, Kassam or Puri asked Left something to the effect of, "Do you mind if we pay Kurt and he pays you?" They were

FIRST AMENDED COMPLAINT

referring to Kurt Feshbach, President of Falcon Research. Left did not care how Anson paid him, and assumed the request was one of convenience, so he said okay.

56.     Because accepting payment through a third-party intermediary wasn't Left's idea, he did not know who he should invoice, so he asked Feshbach in a direct message, "am i invoice you[sic] or Falcon?" Feshbach responded, "Falcon."

- 13 -

FIRST AMENDED COMPLAINT



FIRST AMENDED COMPLAINT



**E.      Defendants' Motive Was to Conceal Their Conflicts of Interest**

69.      ██████████████████████████ was, in fact, par for the course for Kassam and Puri. It is how they avoided regulatory scrutiny.

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Anson was participating in a bought deal offering for Namaste, announced on September 26, 2018, in which Anson would

- 15 -

FIRST AMENDED COMPLAINT

take a long position in the stock. ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

██ ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

73.    Defendants therefore did not want to make it appear that they paid a short seller to drive the price down so that the financing would be more favorable for them, while they profited off the price dip on a short position.

74.    And that is precisely what they did. Kassam and Puri devised to leverage the exposure of Namaste as a fraud to pressure the bought deal's underwriter, Eight Capital, LP ("Eight Capital"), to either cancel the deal or give Anson a discount on the stock. The former would plunge the stock price even further, in which case Anson could cover its short position for a higher profit; the latter would allow Anson to take a long position at a steep discount.

75.    On September 26, 2018, Kassam texted Puri and Left that "Namaste bot deal [m]ay be even better now," because Kassam "know[s] the lead order" and "[t]hey will force a reprice [o]r tell 8 [Capital] they are walking."

76.    On September 30, 2018, Puri sent Left a draft follow-up report on Namaste. This new report from Defendants included language "recommend[ing]

- 16 -

investors that bought the $3/share financing to rethink their purchase"—referring to the original pricing on the bought deal financing.



79.     Kassam knew what he was doing. ███████████████

80.     On October 28, 2018, Left texted Puri that he "might take down the namaste website" (namastetruth.com), but Puri asked him not to do so until "[a]fter close" (*i.e.*, after Anson closed the bought deal financing at a discounted price).

- 17 -



84. Anson also fed short seller Nathan Anderson research and paid him to publish two reports through his platform Hindenburg Research on March 21 and 22, 2018, exposing Canadian cannabis company Aphria Inc. as a fraud. Instead of paying Anderson or Hindenburg directly, Puri worked with Moore to arrange for Anderson to be paid through invoices submitted by a separate company, Clarity Spring, in April 2018.



86. In deposition testimony he gave on March 21, 2024, Kassam denied having anything to do with those reports. When explicitly asked whether "Anson provide[d] Mr. Anderson or anyone at Hindenburg with research about Aphria prior to the publication of this report," Kassam responded, "I don't believe we had anything to do with the issues around [Aphria subsidiary] Nuuvera and Aphria." Kassam shrewdly added the caveat that he "can't be sure of what specifically was said or not," when, in fact, he privately bragged in relation to Aphria: "I gave Hindenburg his entire file."

- 18 -

FIRST AMENDED COMPLAINT

87.     As another example, in mid-2019, Anson worked with stock analyst Robert Doxtator to publish a report through his Twitter platform, Betting Bruiser, exposing cannabis company CannTrust as a fraud. In exchange, Kassam told Doxtator, Anson would "short 20m" of the stock and pay him "15 % of profits."

88.     As with Namaste and Eight Capital, Kassam then leveraged the report to pressure the underwriter of CannTrust's bought deal financing that Anson was participating in to give Anson a better price on the stock. In an email to the deal's underwriter, Kassam even appeared to fabricate that Anson was "being inundated with calls from class action lawyers" and implicitly threatened that Anson would participate unless the underwriter "d[id] the right thing" and dropped the price.

89.     When Doxtator asked Kassam about the email and whether he was "trying to start a class action here," Kassam appeared to concede he had made up the notion that Anson was fielding numerous calls from class-action lawyers ("Haha just rattling cages"). Kassam further admitted that Anson had "played 10m in that deal" and that their goal was to get a "reprice [of] the offering … or cancellation." But because of the obvious conflict that this tactic created, Kassam cautioned Doxtator regarding his email to the underwriter: "Don't post that obviously."



FIRST AMENDED COMPLAINT



**F.     Kassam and Puri** ██████████████████████

96.     In or around 2018, the SEC, in parallel with the DOJ, opened an investigation entitled "In the Matter of: Trading in Advance of Certain Online Stock Commentary."

97.     Because of subpoenas issued by the SEC and the FBI, it was well publicized during the investigation that both criminal and civil regulators were investigating short sellers and hedge funds.[6]

98.     Upon information and belief, Anson, together with its principals, became a target of that investigation.

██     As a part of the parallel SEC and DOJ investigations, ██████

100.     SEC deposition testimony is routinely provided to federal criminal prosecutors as part of a parallel investigation, and testimony before the SEC can be used to prosecute an individual for criminal securities fraud.

---

[6] *See, e.g.*, Jody Godoy, Svea Herbst-Bayliss & Chris Prentice, *Carson Block's Muddy Waters Among Short Sellers Being Probed by U.S. Justice Dept.*, REUTERS (Feb. 16, 2022), https://www.reuters.com/business/finance/federal-prosecutors-probing-short-sellers-wsj-2022-02-16/.



FIRST AMENDED COMPLAINT

108. Of course, Puri, like Kassam, was well aware that Left had nothing to do with directing payments through Falcon Research using falsified invoices and that it was, in actuality, he and Kassam who arranged to use an intermediary to pay Left.

### G. The SEC Investigates Anson (Again) and Fines It (Twice)

111. The government was onto at least some of Defendants' misconduct.

112. On October 19, 2023, the SEC entered into a settlement agreement with Anson Advisors for buying stock in public offerings for private fund clients after shorting the very same stock, in violation of the Exchange Act. Anson Advisors paid $3.33 million in disgorgement and penalties.[7]

113. On June 11, 2024, the SEC entered into a *second* settlement agreement, this time with Anson Advisors *and* Anson Funds for numerous securities law violations. The SEC's order concluded that Anson willfully misled investors by failing to disclose that it paid short sellers to publish negative articles about companies

---

[7] *See* Order, *In the Matter of Anson Advisors, Inc.*, Inv. Adv. Act Rel. No. 98775 (Oct. 19, 2023), https://www.sec.gov/files/litigation/admin/2023/34-98775.pdf.

it had taken a short position in, including specifically failing to disclose that it paid Left for publishing research about Namaste that Anson then traded around.[8] Anson paid $2.25 million in penalties.

114. ███████████████ the Falcon Research invoices were critical to the second investigation and settlement.

115. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ the SEC provided ██████ *Wells* notices to Plaintiffs.

█████ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████

█████ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[8] *Supra* n.1.



120. ███████████████████████

██████████████████████████████ the SEC believed that Anson was defrauding its investors by executing transactions for Left in its funds.

121. Anson CEO Nathoo knew that executing undisclosed transactions for third parties in its funds was a suspect practice, ██████████████████████ ███████████████████████████████

122. In deposition testimony he gave in a separate defamation matter in Canada on March 21, 2024, Kassam admitted the payments to Plaintiffs had nothing to do with "research" and were not "compensation" for anything. When asked, "Did Anson ever pay Mr. Left to write any report or publish any tweets about [cannabis company] Aphria" or "on any matters, any tickers other than – excluding Aphria?" Kassam responded unequivocally, "We have never paid Andrew for anything associated with Aphria…. We have never paid Andrew on *any matter*."

FIRST AMENDED COMPLAINT

124. The June 11, 2024, administrative settlement between Anson and the SEC had just fifteen factual paragraphs. The SEC did not charge any individuals, such as Kassam or Puri, and Anson did not admit or deny any of the allegations.

125. The SEC's factual rendition effectively repeated ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. One paragraph stated: "As a result of AIMF's [Anson Investment Master Fund's] trading in Namaste … [Left] was owed … trading profits. [Left] did not pay or contribute funds to [Anson] to purchase securities in [] Namaste…. ***[Left] asked Anson Advisors to send him his share of trading profits through a third-party intermediary, to which [Anson] agreed.*** The third-party intermediary provided Anson Funds with invoices for purported research services that had not been performed by the third-party intermediary and inaccurately stated that the amounts invoiced were for the benefit of the third-party intermediary, when they were for the benefit of [Left]. Anson Funds issued payment to the third-party intermediary, and [Left] collected payment from that third-party intermediary."

**H.    The DOJ and SEC Prosecute Left Based on ▮▮▮▮▮▮▮▮▮▮**

126. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Accordingly, Defendants knew, or consciously disregarded a substantial risk, that their lie would result in civil and criminal charges against Plaintiffs but told these lies anyway to save their own skins. It worked—Anson did not "admit or deny" any allegations, and no

FIRST AMENDED COMPLAINT

individual who worked at Anson, including Kassam and Puri, were charged or fined for their misconduct.

127.   Left, however, *was* charged for Defendants' misconduct.

128.   On July 25, 2024, the DOJ indicted Left, charging him with criminal securities fraud. The Indictment devoted nearly two-pages to the topic of the false invoices and the payments from Anson. The Indictment listed out each invoice, and alleged, as evidence of consciousness of guilt, that "[d]efendant LEFT directed [Anson] to send defendant LEFT's share of the trading profits" from shorting Namaste "through a third-party intermediary to conceal the true beneficiary and purpose of the payments," and that "at defendant LEFT's direction, [Feshbach] provided [Anson] with false invoices."

129.   In addition, directly borrowing from ███████████████ ██████████████████████ (as opposed to receiving payment for trades made on his behalf), the Indictment claimed that Left lied to federal agents when he told them (truthfully) that there was no "compensation" between himself and hedge funds. This was false, the Indictment claimed, because "defendant LEFT received compensation from [Anson] in advance of the issuance of Citron's commentary." Left has been charged with criminal violations of 18 U.S.C. § 1001 because of these alleged false statements.

130.   The DOJ all but confirmed Left was indicted based on Defendants' lies when it argued, in opposition to Left's motion to dismiss the Indictment for selective prosecution, that Left was not similarly situated to other investors who engaged in similar stock commentary on social media because, the DOJ alleged, none "of these individuals created or directed others to create fake invoices (Ind. ¶¶ 102-103) or made false statements to law enforcement (Ind. ¶¶ 103-104)." The centrality of the false invoice allegations to the government's case is further confirmed by the DOJ's

- 26 -

statement in its opposition that Left's efforts to "cover [] up" the payments from hedge funds, including ███, were "central to his market manipulation scheme."

131.     On July 26, 2024, the SEC filed a complaint against Plaintiffs for claims of civil securities fraud. The SEC similarly alleged, as evidence of consciousness of guilt, that "Left took steps to conceal that he was being compensated by Anson in connection with" shorting Namaste "by asking Anson to send him his share of trading profits through [Falcon Research]."

## I.     Left Discovers Defendants' Lies

132.     Left was shocked when he read the DOJ's and SEC's allegations that it was he who directed Anson to pay him his Namaste trading proceeds through Falcon Research, when the opposite was true. He did not know how the government got it so backwards and thought it must be a mistake.

133.     Left had no reason to suspect it was Anson and its principals who devised a scheme to blame Left for the █████. Left and Anson's principals were good friends and Left had no reason to believe that his friends would have lied to █████ to blame Left for their own actions. Indeed, as set forth below, Anson's principals continued to send Left friendly messages well after Left's indictment, intentionally lulling him into a false sense of belief that Anson and its principals were not to blame for the DOJ's "mistake."

134.     On or after October 8, 2024, the DOJ sent a letter to Left's counsel concerning discovery "Production 3," which stated that the DOJ would provide a hard drive to counsel containing this production.

135.     Included on the hard drive later received by Left's present counsel (containing Production 3) were ██████ ████ Although Defendants had previously provided the transcripts to Left's former counsel under a joint defense agreement in November 2023, they

- 27 -

FIRST AMENDED COMPLAINT

designated the transcripts "Attorneys' Eyes Only," which meant that Left's former counsel did not (and could not) disclose the contents of the transcripts to Left.

136. It was only after October 8, 2024, when the government produced the transcripts to Left—pursuant to a protective order that authorized Left to finally review the discovery—that Left had access to the transcripts. Prior to then, pursuant to the Attorneys' Eyes Only agreement, Left had no ability to access the transcripts and could not have reasonably discovered Defendants' lies.

In 2025, when reviewing discovery for the first time, Left discovered by reading ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

138. Further, it was not until late September 2025 that the DOJ, acknowledging the parallel investigation between itself and the SEC, released to Left's counsel ████████████████████████████████████████████████████████████████████████████████████████████████████████

139. Prior to receiving the evidence produced by the government, Left had no knowledge of Defendants' misconduct and no reason to suspect that Defendants had falsely implicated him in the ████████████████. During that time, Defendants continued to maintain friendly and cordial communications with Left, further concealing their misconduct and reinforcing Left's reasonable belief that Defendants had acted in good faith. For example, Defendants Kassam and Puri exchanged routine personal messages with Left, including holiday and birthday well-wishes and invitations to meet socially.

- 28 -

FIRST AMENDED COMPLAINT

140. In January 2023, Kassam sent Left a message wishing him a "Happy New Year[]" and "all the best in 2023!" In February 2025, seven months after Left was indicted (and when the government forbade Left from meeting or speaking with Kassam), Kassam invited Left to meet for a drink in Boca Raton.



141. That Kassam asked to meet with Left for a friendly drink seven months after the Indictment was issued by the DOJ (and with Left's response being "would have loved to") confirms that Anson had covered up its involvement in pinning the blame for the invoices on Left and also confirms that Left did not know about Anson's responsibility for pinning the false invoice scheme on Left. Kassam's friendly text messages lulled Left into believing that Anson had nothing to do with the DOJ's pinning the blame for the invoices on him.

- 29 -

142.    Similarly, on August 1, 2024 (a month after Left's indictment), Puri attempted to call Left. Left, not knowing that it was Puri who lied ███████████████, wrote back, "U know I love u but I can't talk to you." Left was prohibited by the DOJ from speaking with Puri, which further prevented Left from learning the truth. In July 2025, a year after Left's indictment, Puri sent Left a message stating, "Happy birthday Andrew, hope the day is awesome and the start to a good year." Left responded with a "heart" emoji, further confirming that Left was unaware that Puri and Kassam had concocted a scheme to lie ███████████████.



143.    These ongoing friendly communications were inconsistent with any adversarial relationship and gave Left no reason to suspect that Defendants had falsely and intentionally blamed him for the ███████████████ to save themselves and

- 30 -

their fund, or that they were otherwise responsible for the prosecutorial and regulatory actions taken against him.

### J.    Plaintiffs Suffer Damages Because of Defendants' Misconduct

144.    The DOJ's and SEC's public law enforcement actions, together with the extensive media coverage they have drawn, have resulted in severe damage to Plaintiffs.

145.    Left has been indicted by the DOJ, and Plaintiffs have been sued by the SEC, at least in part because of Defendants' ███████████████████.

146.    Defendants' lies have severely damaged Left's reputation, and that of his company Citron. Left was once seen as a man who routinely exposed fraudulent companies, but he now was falsely accused of having committed fraud himself.

147.    Because of the enforcement actions and the attention they drew, Plaintiffs had to cut back on trading and divert their efforts to defending themselves. Trading is how Left makes his living, and Plaintiffs lost millions of dollars in probable earnings as a result.

148.    Plaintiffs also have had to spend significant sums of money on legal expenses. Their defense costs alone, including attorneys' fees and legal expenses post-Indictment and -SEC Complaint, have exceeded $1,000,000.

### K.    In Pre-Filing Discussions, Anson Confirms It Misled ███████

149.    Prior to filing this Complaint, Plaintiffs' counsel approached Defendants' counsel to discuss their claims and attempt to mitigate damages.

150.    As part of those discussions, Plaintiffs and Defendants entered into tolling agreements that tolled the statute of limitations periods for Plaintiffs' defamation and trade libel claims from October 1, 2025, to October 29, 2025.

151.    During the parties' discussions, Defendants essentially conceded, in writing, that they had ███████████████████████████████. Effectively,

FIRST AMENDED COMPLAINT

Defendants claim, in an attempt to argue that they did not defame Plaintiffs, that they never ███████████████████████████████████.

152.    This representation contradicts Defendants' ████████

███████████████████████████████████████████████████

████████████████

**L.    In Post-Filing Remarks to the Press, Anson Defames Plaintiffs Again**

153.    After Plaintiffs filed their initial Complaint on October 30, 2025, a "spokesman for Anson" told the press that "Kassam and Puri testified truthfully under oath," that the Complaint was "absurd[]," "meritless," and "a desperate and extreme attempt to manipulate the legal system ahead of [Left's] criminal trial," and that Left is "willing to say anything to try to escape accountability."[9]

154.    In essence, Defendants, through their spokesperson, publicly accused Plaintiffs of lying to the Court with corrupt intent to influence the proceedings in Left's criminal matter, *i.e.*, obstruction of justice—a *crime*.

155.    Defendants' statement is categorically false. As demonstrated by the mountain of evidence described in the Complaint, *Defendants* are the ones who lied to manipulate the justice system, Plaintiffs paid the price, and now Plaintiffs are seeking to be made whole, as is their right. The anonymous "spokesman for Anson" cited no evidence to support their baseless assertion that Plaintiffs acted in bad faith, because there is none.

156.    In fact, the DOJ has now confirmed that Anson lied to law enforcement, as they have submitted a superseding indictment in advance of the criminal trial withdrawing the accusation that Left concocted a false invoice scheme.

---

[9] Tom Schoenberg, *Short Seller Andrew Left Says Hedge Fund Lied to SEC About Payment in Trading Probe*, BLOOMBERG (Oct. 31, 2025), https://www.bloomberg.com/news/articles/2025-10-31/short-seller-andrew-left-says-hedge-fund-lied-to-sec-about-payment-to-him.

- 32 -

FIRST AMENDED COMPLAINT

**M.    Defendants' Lies Disparaged the Character of Plaintiffs' Business**

**1.    Citron and Left Are Indistinguishable Such That Statements About Left Concern Citron's Business**

157.    Even though Citron Capital is organized as a limited liability company, its business is carried out entirely through Left as its sole decisionmaker and public-facing representative.

158.    Citron does not have outside investors and instead exists solely to trade Left's own capital. Citron does not operate as a multi-person firm, but as a single-person business through which Left conducts his investment activities.

159.    Citron Research is not a separate legal entity, but rather the name under which Left publishes research and communicates with the market. All research, analysis, and trading decisions attributed to Citron are made by Left himself.

160.    Because Citron's business consists entirely of Left's activities—publishing research and trading based on that research—Citron and Left are indistinguishable in practice. Statements about how Left conducts research, communicates with the market, or engages in trading necessarily describe how Citron operates as a business.

161.    Market participants, financial media, and industry publications likewise refer to Citron and Left interchangeably, reflecting that Citron's business and reputation are inseparable from Left himself.

162.    Accordingly, statements impugning the honesty, integrity, or trading practices with which Left conducts his business activities necessarily constitute statements about Citron's business.

**2.    Defendants' Statements Were Understood—and Intended—to Refer Directly to Citron's Business**

163.    Defendants' statements did not merely implicate Citron; they directly targeted Citron's business operations. As explained *supra*, ███████ ███████ expressly attributed the ███████████████████████ to Citron itself,

- 33 -

FIRST AMENDED COMPLAINT

asserting that ███████████████████████████████ and that, ████████

███████████████████████████████████████████████████████████████

██████████████████████████ In so arguing, Anson quoted, *verbatim*, the ████

████████ of both Kassam and Puri. These submissions thus framed the alleged

conduct as corporate activity undertaken through Citron's business operations and

made clear that Defendants' ████████ was not just about Left but Citron too.

164.    The ████████████ further confirm that Defendants understood the

SEC was evaluating Citron—not just Left—as a participant in the alleged scheme.

Specifically, Defendants argued that, with respect to ███████████████████

the SEC was ██████████████████████████████████████████████

███████████████████████████████ Thus, when Defendants

provided their false ████████████, they knew that ████████ would be

understood by the government as implicating Citron itself, in addition to Left.

165.    A reasonable observer would have understood Defendants' statements

in precisely this way, and the government—the target audience—in fact did so. The

DOJ's Indictment alleged that Left conducted business "under the name 'Citron

Research,'" and expressly characterizes Citron Research as Left's "online moniker"

(*i.e.*, an alias for Left himself). This framing treats Citron as the vehicle through which

Left operates his business.

166.    The SEC likewise adopted this understanding. In its complaint, the SEC

charged both Left and Citron as defendants and alleged that "Left *and Citron*

*Research* [] engaged in several deceptive acts," including that "Left took steps to

conceal that he was being compensated by Anson in connection with using his Citron

Research platform," and that "Left [] created phony invoices … for the purpose of

concealing that he was receiving over $1 million from a hedge fund in exchange for

Citron Research publishing certain reports and tweets."

167.    The SEC also alleged that "Left, *who controlled Citron Research and whose mental state was imputed to it*, … took active steps to conceal the financial arrangements he had with … Anson, including working with Anson to funnel profits through a third-party intermediary pursuant to sham invoices," and that by doing so, "Left concealed his own *and Citron Capital's* financial motivations in issuing publications, and perpetuated the false and misleading impression that Citron Research was an independent research firm." These allegations expressly tie the purported invoice scheme to Citron's publishing platform and business operations.

168.    The SEC's settlement order in the Anson investigation likewise confirms that the alleged invoice scheme was understood as involving a publishing business (Citron), not merely an individual actor (Left). The order defines "Short Publisher A" as "an activist short publisher that presents itself to the market as an independent research firm" and that "purports to expose frauds or other problematic conduct … through its own website and twitter feed." It further describes arrangements in which the publisher would "share its work with [Anson] prior to public posting," and, "[i]n exchange, [Anson] agreed to pay the short publisher … based on a percentage of [fund] profits from trading in the target security."

169.    The order also explains that payments were structured through intermediaries and tied to the publisher's activities and output. By defining the relevant actor as a publishing entity ("Short Publisher A") and not just an individual ("Individual A"), tying compensation to its "work," and describing payments made to the "short publisher" itself, the SEC treated the alleged arrangement—including the use of invoices—as part of a business-to-business relationship with a publishing platform, rather than a purely personal arrangement with an individual.

170.    Accordingly, Defendants' false statements that Plaintiffs ███████ ████████████████████████████████████████████████████████ necessarily conveyed that the alleged misconduct was carried out through Citron's research and

- 35 -

trading operations and directly concerned the manner in which Citron's business operated.

### 3. Defendants' Statements Derogated the Character of Citron's Business

171. Defendants' statements directly derogated the integrity and legitimacy of Citron's business by portraying its research platform as a vehicle for undisclosed compensation arrangements, sham invoices, and deceptive practices.

172. In the context of Plaintiffs' business, these statements did not merely concern Left personally, but directly impugned the integrity, legitimacy, and lawfulness of Citron's investment research and trading operations, including by suggesting that Citron's published research and trading positions were part of a fraudulent scheme involving undisclosed compensation and falsified records.

173. As reflected in the SEC's allegations that "Left took steps to conceal that he was being compensated by Anson in connection with using his Citron Research platform," that he "created phony invoices … for the purpose of concealing" payments tied to Citron Research publications, and that, through this conduct, "Left concealed his own and Citron Capital's financial motivations in issuing publications, and perpetuated the false and misleading impression that Citron Research was an independent research firm," Defendants' statements necessarily conveyed that Citron's operations were not independent or credible, but instead were driven by undisclosed financial arrangements and deceptive practices, rendering them fraudulent and unreliable.

174. The SEC's enforcement action further confirms the business-derogating nature of these accusations. The SEC asserted claims against Citron itself and sought remedies—including disgorgement, penalties, and an investment adviser bar—that would effectively impair or destroy Citron's business.

- 36 -

FIRST AMENDED COMPLAINT

**4.      Defendants' Statements Caused Harm to Citron's Business**

175.    Citron's business consists of publishing investment research and commentary concerning publicly traded companies and engaging in trading based on that research. The value of Citron's business depends on the credibility, integrity, and perceived independence of its research and trading activities.

176.    Citron's research and trading activities are informed by a collaborative process that includes discussions with other market participants, including analysts, investors, and other industry professionals, regarding publicly available information and market developments. The effectiveness and quality of Citron's research, and the profitability of its resultant trades, depend on its ability to maintain credibility and trust within this network of market participants.

177.    If Citron's reputation is impugned through false statements about Left's honesty, integrity, or trading practices—including statements that he "created phony invoices" or concealed compensation tied to Citron Research publications—market participants are less willing to engage with Plaintiffs, share information, or participate in these discussions.

178.    The resulting loss of access to information and professional collaboration diminishes the quality of Citron's research and impairs its ability to engage in profitable trading activities.

179.    Defendants' statements would naturally and foreseeably deter, and have deterred, market participants from communicating or engaging with Plaintiffs, impair Plaintiffs' access to information, and damage Citron's business relationships, thereby diminishing the quality of Citron's research and causing harm to its business and operations.

180.    Defendants' statements also resulted in enforcement actions that directly targeted Citron itself, including claims against the business entity and

- 37 -

requests for remedies that would impair or prevent its continued operation, causing concrete harm to Citron's business.

### N.    Defendants Profited from Their Misconduct

181.    Defendants' false statements ▮▮▮▮▮▮▮▮▮▮ were not merely defensive—they were designed to and did allow Defendants to avoid significant regulatory consequences, including civil enforcement actions, individual liability for Kassam and Puri, and potential trading restrictions or suspensions.

182.    By falsely attributing the ▮▮▮▮▮▮▮▮ to Plaintiffs, Defendants avoided being charged with fraud-based violations that would have resulted in substantial penalties, disgorgement obligations, and/or restrictions on their ability to manage assets and trade securities.

183.    As a result of Defendants' misconduct, Anson was permitted to continue operating its investment funds without interruption, retain its existing investor base, and continue to earn management fees, performance fees, and trading profits. Defendants Kassam and Puri, as senior principals and decisionmakers of Anson, directly benefited from these revenues through compensation, profit participation, and other financial interests tied to the performance and assets under management of the funds.

184.    Upon information and belief, if Defendants were to have truthfully disclosed their role in the false invoice scheme, they would have faced enforcement action that would have materially impaired their business operations, including the loss of investor capital, reputational damage, and limitations on their trading activities.

185.    Instead, Defendants were able to preserve and continue generating substantial revenues, including fees and profits derived from assets under management that they retained and grew during the period in which they avoided meaningful regulatory consequences.

- 38 -

186.    The profits and fees earned by Defendants during this period were obtained and preserved, at least in part, through Defendants' misconduct, including their false ███████, misleading submissions to ███████, and concealment of their scheme. Defendants have therefore been enriched by profits and financial benefits that they would not have obtained or retained in the absence of their wrongful conduct.

187.    During the period in which Defendants avoided meaningful regulatory consequences through their misconduct, Anson managed more than $2 billion in assets and generated substantial revenue through management and performance fees. As disclosed in Anson's filings with the SEC, Anson charges an annual management fee of approximately 2% of assets under management and a performance allocation of approximately 20% of annual net trading profits, subject to a high-water mark. Based on these disclosed fee structures and Anson's assets under management during the relevant period, the profits and fees that Defendants obtained or retained through their misconduct were in the tens to hundreds of millions of dollars.

## FIRST CAUSE OF ACTION

### (Defamation and Defamation *Per Se*, Cal. Civ. Code §§ 44–46)

188.    Plaintiffs repeat, re-allege, and incorporate by reference the allegations in Paragraphs 1–187 as if set forth fully herein.

189.    In at least October 2025, Defendants published or caused to be published defamatory statements to the press, which contained unprivileged false assertions of fact of and concerning Plaintiffs, which the press then re-published in news articles.

190.    ████████████████████████████████████████ Defendants published or caused to be published defamatory statements ████████████████, which contained

- 39 -

FIRST AMENDED COMPLAINT

unprivileged false assertions of fact of and concerning Plaintiffs, which ███████ ███████████████████████████████████████.[10]

191. ████████████████████████████████████████████ ██████████████████████████████████ Defendants made false reports to ███████ a civil law enforcement agency, which contained unprivileged, false assertions of fact of and concerning Plaintiffs, which █████████████████████████████████ ████.

192. The defamatory statements are defamatory *per se* because they impute serious criminal misconduct to Plaintiffs, injure them in their trade or profession, and/or describe conduct, characteristics, or conditions incompatible with the proper exercise of a lawful business, trade, or profession, and otherwise subject Plaintiffs to hatred, distrust, ridicule, contempt, or disgrace.

193. No reasonable person under the circumstances would have published the defamatory statements.

194. Defendants published or caused to be published the defamatory statements with knowledge that they were false and/or with reckless disregard for their truth or falsity.

195. Upon information and belief, Defendants published or caused to be published the defamatory statements with the specific intent to cause harm to Plaintiffs, showing willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, justifying an award of punitive damages.

196. Defendants have also acted to cover up their lies ████████████████ by repeatedly sending Left loving and caring messages after his Indictment in the hope

---

[10] California Civil Code Section 47(b)(5) provides that communications concerning potential criminal activity between a person and law enforcement are not privileged when made with knowing falsity or with reckless disregard for the truth or falsity of the communications.

FIRST AMENDED COMPLAINT

of causing Left to believe that it was not them who made ███████████ ████████ that resulted in his Indictment.

197.    As a direct and proximate result of the defamatory statements, Plaintiffs have suffered presumed, actual, and special damages, including humiliation, damage to reputation, lost business opportunities, and other pecuniary damage.

## SECOND CAUSE OF ACTION

### (Business Disparagement, Cal. Civ. Code §§ 44–46)

198.    Plaintiffs repeat, re-allege, and incorporate by reference the allegations in Paragraphs 1–187 as if set forth fully herein.

199.    ████████████████████ ████████████████████████████ Defendants published or caused to be published disparaging statements ████████████████, which contained unprivileged false assertions of fact of and concerning the character of Plaintiffs' business, which ████████████████████ ████. For example, Defendants' ████████████████ expressly attributed the alleged scheme to Citron, asserting that ████████████████ and that Anson ████████████.

200.    ████████████████████████ ████████████████████ Defendants made false reports to ████ a civil law enforcement agency, which contained unprivileged, false assertions of fact of and concerning Plaintiffs, which ████████████ ████████████.

201.    The disparaging statements specifically referred to Plaintiffs' business because they accused Plaintiffs of engaging in deceptive and unlawful practices in connection with their trading and research activities, including the use of sham invoices and undisclosed compensation arrangements.

FIRST AMENDED COMPLAINT

202. These statements clearly derogated the quality and integrity of Plaintiffs' business by conveying that Citron's investment research and trading operations were dishonest, fraudulent, and unreliable, and were therefore not fit for reliance by investors, counterparties, or the market.

203. No reasonable person under the circumstances would have published the disparaging statements.

204. Defendants knew that others, including the SEC and DOJ, would act in reliance on their disparaging statements, causing Plaintiffs financial loss.

205. Defendants published or caused to be published the disparaging statements with knowledge that they were false and/or with reckless disregard for their truth or falsity.

206. Upon information and belief, Defendants published or caused to be published the disparaging statements with the specific intent to cause harm to Plaintiffs, showing willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, justifying an award of punitive damages.

207. As a direct and proximate result of the disparaging statements, Plaintiffs have suffered presumed, actual, and special damages, including lost business opportunities and other pecuniary damage.

## THIRD CAUSE OF ACTION

### (Quasi-Contract/Unjust Enrichment)

208. Plaintiffs repeat, re-allege, and incorporate by reference the allegations in Paragraphs 1–187 as if set forth fully herein.

209. As alleged herein, Defendants received and retained substantial financial benefits, including management fees, performance fees, and trading profits, as a result of their misconduct.

- 42 -

FIRST AMENDED COMPLAINT

210.   Defendants' enrichment was unjust because it was obtained through wrongful conduct, including false ████████████████, misleading submissions to ██████, and concealment of their role in the ████████████.

211.   By engaging in such misconduct, Defendants avoided regulatory consequences that would have impaired their ability to operate, manage assets, and generate revenue, and thereby retained and continued to obtain profits they would not have otherwise obtained or retained.

212.   Plaintiffs are entitled to restitution because Defendants' enrichment was at Plaintiffs' expense, including through the shifting of regulatory scrutiny and liability onto Plaintiffs and away from Defendants.

213.   In addition, and independently, Plaintiffs are entitled to nonrestitutionary disgorgement because Defendants obtained and retained profits through conscious wrongdoing, and equity requires that Defendants not be permitted to profit from their misconduct.

214.   The profits subject to disgorgement include, without limitation, fees and trading profits obtained or retained during the period in which Defendants avoided regulatory consequences as a result of their misconduct.

215.   Plaintiffs lack an adequate remedy at law with respect to Defendants' unjust enrichment because monetary damages alone cannot fully address Defendants' wrongful retention of profits obtained through misconduct.

216.   Accordingly, Plaintiffs seek restitutionary and nonrestitutionary disgorgement of all profits Defendants unjustly obtained or retained as a result of their misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor, and against Defendants, awarding the following relief:

- 43 -

FIRST AMENDED COMPLAINT

A.   General damages, including actual and presumed damages, in an amount to be determined at trial;

B.   Special damages, including actual and consequential damages, in an amount to be determined at trial;

C.   Punitive and/or exemplary damages in an amount to be determined at trial;

D.   Restitutionary and nonrestitutionary disgorgement in an amount to be determined at trial;

E.   Reasonable expenses, including but not limited to reasonable costs and attorneys' fees, incurred to mitigate the harm caused by Defendants' defamatory and tortious conduct, including without limitation the fees incurred in defending against Defendants' false and defamatory statements and money spent on efforts to counteract the negative impact of Defendants' defamatory statements on Plaintiffs' reputation;

F.   Reasonable costs and attorneys' fees incurred in bringing this action to restore Plaintiffs' reputation;

G.   All costs, disbursements, fees, and pre- and post-judgment interest as permitted by law; and

H.   Any other and further relief this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand that this case be tried to a jury.

Dated: April 2, 2026

/s/ Eric S. Rosen
Eric S. Rosen (*pro hac vice*)
Michael B. Homer (*pro hac vice*)
Yusef Al-Jarani

**DYNAMIS LLP**

*Attorneys for Plaintiffs Andrew Left
and Citron Capital, LLC*

- 44 -

FIRST AMENDED COMPLAINT